# EXHIBIT H

Page 1

1                                   VOLUME:  I

                                    PAGES:   1-252

2

3                  UNITED STATES DISTRICT COURT

4              FOR THE DISTRICT OF MASSACHUSETTS

5              CIVIL ACTION NO. 1:24-cv-10509-PBS

6    _____

7    KOBEAY SWAFFORD,                       )

8                    Plaintiff,             )

9                vs.                        )

10   RENTGROW, INC., and DOES 1-10,         )

11                   Defendants.            )

12   _____)

13

14

15                    DEPOSITION OF KOBEAY Q. SWAFFORD,

16   called as a witness by and on behalf of the

17   Defendants, pursuant to the applicable provisions

18   of the Federal Rules of Civil Procedure, before P.

19   Jodi Ohnemus, RPR, RMR, CRR, CA-CSR #13192, NH-LSR

20   #91, MA-CSR #123193, and Notary Public, within and

21   for the Commonwealth of Massachusetts, at Troutman

22   Pepper Locke, 125 High Street, Boston,

23   Massachusetts, on Friday, February 14, 2025,

24   commencing at 9:03 a.m.

25

Page 45

1   robbery?

2        A.   Yes.  I'm sorry.  I'll get back to that,

3   you know.  It's a lot of stuff.  I'm just trying

4   to -- excuse me; but, yeah, I'm trying to the best

5   I can.

6        Q.   I understand.  And I believe -- did you

7   serve about three years in prison?

8        A.   Yes.

9        Q.   Okay.  I want to put aside the -- the 2005

10  murder charges and the other incidence relating to

11  that.  So put those aside for right now.

12            Any other felony charges that you've had

13  in your life beyond what we've discussed?

14       A.   No.

15       Q.   Is that a no?

16       A.   No.

17       Q.   All right.  And how about misdemeanor

18  charges, nonfelonies?  Have you been charged with

19  any misdemeanors?

20       A.   Not that I can remember at the moment, no.

21       Q.   All right.  Okay.  So let me go to the --

22  in 2005 in Michigan you were charged with first

23  degree murder, weapons felony firearm, and assault

24  with intent to murder; right?

25       A.   True.

Kobeay Swafford                                    February 14, 2025

Page 47

```
 1       A.   Like I say, they -- they put some charges
 2   on me, and it was dismissed and...
 3       Q.   But are you saying you didn't do it or --
 4   I understand the charges were dismissed.
 5       A.   I'm saying -- want me to answer that --
 6       Q.   Well, okay.  Did you deny your guilt at
 7   trial?
 8       A.   Did I deny my guilt?
 9       Q.   Yes.
10       A.   I pled not guilty.
11       Q.   Okay.  And then you were convicted by a
12   jury, and then the charges were later dismissed; is
13   that right?
14       A.   It was dismissed.  Then I was convicted
15   after it was dismissed, and then they dismissed it
16   again.
17       Q.   Okay.  So if I've got the sequence of
18   events right, the charges were initially dismissed.
19   Then they were reinstated.  Then you were convicted
20   by a jury, and then the charges were ultimately
21   dismissed; is that right?
22       A.   Yes.
23       Q.   Okay.  And my understanding of this
24   dismissal is that they were dismissed under
25   something called the Interstate Detainer Act?
```

 1      A.    Interstate Agreement on Detainers.

 2      Q.    Yeah, you've heard of that?

 3      A.    Yeah, it's like a writ, yeah.

 4      Q.    So you were dismissed because the state

 5   had failed to comply with that act.

 6            Is that your understanding?

 7      A.    Yes.

 8      Q.    Okay.  And you spent a -- I think you

 9   believe you spent a couple years in prison; is that

10   right?

11      A.    I did five all together.  Three for the

12   federal, about 36 months, and then two state.

13      Q.    Okay.  Are you still talking about these

14   murder charges, the five years?

15      A.    Three was for the bank robbery --

16      Q.    Right.

17      A.    -- federal, and that's why I did the

18   Interstate Agreement on Detainers while I was doing

19   my federal time, and then after I finished that,

20   the state came and got me, and I did two on that.

21      Q.    Okay.  And were you in -- for the two

22   years that you did relating to the murder charge

23   and the other charges, were you incarcerated in

24   Michigan?

25      A.    I was -- yeah, Iona State.

Page 49

```
 1      Q.   Did you say Iona?

 2      A.   In Michigan.

 3      Q.   That's in Michigan?

 4           So you were under the supervision of the

 5   Michigan Department of Corrections for two years?

 6      A.   Yup.

 7      Q.   Okay.

 8      A.   Well, yeah.  Sorry about this kind of --

 9      Q.   Yeah.

10      A.   Never mind.

11      Q.   When you were in -- with the three years

12   that you did for the bank robbery, where were you

13   incarcerated?

14      A.   Beckley, West Virginia.

15      Q.   Is that a federal prison?

16      A.   Federal.

17      Q.   Okay.  All right.  We'll come back to the

18   murder-related charge in just a little bit, but

19   let's -- let's switch gears from your background

20   and let's talk about this case.  Okay?

21      A.   (Witness nods.)

22           MR. FOK:  Can we take a break, Counsel.

23   It's been almost an hour.

24           MR. ST. GEORGE:  Sure.  Do you want to

25   just take five minutes?
```

 1        Q.    I'm sorry?

 2        A.    Email.

 3        Q.    Email.  Okay.

 4              So was there any -- was there anything

 5    included with this letter, or was it just the

 6    letter itself?  Do you remember?

 7        A.    I don't remember.

 8        Q.    Okay.  Now this letter doesn't mention

 9    anything having to -- like RentGrow, the name

10    doesn't appear on this letter that's sent to you.

11        A.    No, it was with the apartment complex.

12        Q.    Okay.  So my question was going to be when

13    did you first hear about RentGrow, the name?

14        A.    Once the apartment was -- they did their

15    background check.

16        Q.    So that's the apartment complex in

17    Evansville that you applied to after you got your

18    voucher?

19        A.    Yes.

20        Q.    Okay.  That's the first time you recall

21    hearing the name RentGrow?

22        A.    Yeah, I believe that's the first, yeah.

23        Q.    All right.  And what did you do after you

24    got this letter?  Did you call anybody at

25    Evansville, or did you email them back?

Kobeay Swafford                                    February 14, 2025

Page 108

1      A.    Emailed them.  Sent them some documents.

2      Q.    All right.  So if I'm looking at this

3   letter, it says (as read):

4           "If you disagree with the decision

5   regarding your application, you must request an

6   informal review in writing within ten days from the

7   date of this letter and provide documentation

8   showing a lifestyle change, you completed community

9   service, or something similar to be considered in

10  reversing the decision made."

11          Do you see that?

12     A.    Yes.

13     Q.    Okay.  And is -- is that what you were

14  attempting to do by sending them documentation?

15     A.    Yes.

16     Q.    Okay.  So you were disagreeing with the

17  decision and you wanted to show documentation that

18  would allow you to get the voucher?

19     A.    Yes.

20     Q.    All right.  Were you attempting to show

21  them that you had changed your lifestyle?

22     A.    Attempted to show them that those charges

23  were -- that it was dismissed.  They shouldn't have

24  shown my criminal history.  That's what I was

25  believing.

Kobeay Swafford                                          February 14, 2025

                                                          Page 109

1        Q.    What about the -- I'm sorry.  Go ahead.

2        A.    That was my intent to show them that --

3    that my criminal history that they seen on that was

4    wrong and that charges were dismissed.

5        Q.    And how about change in lifestyle?  Did

6    you want to -- did you intend to advance anything

7    about your lifestyle, any evidence of --

8        A.    As far as?

9        Q.    -- rehabilitation or anything like that?

10       A.    Wasn't that -- I mean, it was just

11   specifically to show them that paperwork.  I mean,

12   my lifestyle always -- well, no to your question.

13   No.

14             It was just to show them that it was --

15   you know, I was working and everything, and I was

16   just showing them -- because Kentucky accepted me.

17   So I didn't see how Evansville didn't accept my

18   voucher.  Whatever information they got, I had to

19   show them they was making a mistake.

20       Q.    Did you follow up with anyone in Kentucky

21   with the denial in Evansville?  Like, did you ever

22   mention that to anyone in Kentucky involved with

23   the voucher program in Kentucky?

24       A.    Yes.

25       Q.    Okay.  What -- what did you do?

Page 122

1   dismissal order, you agree this dismissal order was

2   before you were tried and convicted by a jury;

3   right?

4           MR. FOK:  Objection.  Asked and answered.

5           But you can answer.

6   A.    January 26, '06.

7   Q.    That was before the jury trial?

8   A.    So that was before the jury trial.

9   Q.    Okay.  All right.  Let me go back -- let

10  me go back to your email.  If I can have you turn

11  the page back to your August 21st, 6:38 p.m. email.

12          You also say -- you also say some other

13  stuff that talks to your character; right?  You

14  talk about the judgment of my character, and you

15  say you have an AAS degree, a member of Phi Beta

16  Kappa Honor Society, devout Catholic, members of --

17  member of the Knights of Columbus.  Disabled

18  veteran, productive volunteer and citizen.

19          Do you see that content as well?

20  A.    Yes.

21  Q.    Okay.  Why -- why were you telling

22  Evansville that?  Was it in response to --

23  A.    Because I get judged, and they don't

24  know -- I get judged and, you know, people don't

25  know, you know, the intricate details of things and

Page 123

1    what's been going on in my life, and they see

2    something on paper and this -- I'm -- I'm looked at

3    a certain way.

4            So I'm letting them know, you know, I'm

5    not that person.  I went through a -- you know, my

6    wife -- as far as, like, the bank robbery and

7    everything.  You know, my wife passed.  I was going

8    through a rough -- it was a dark time, you know.

9    Other things happened.

10           They didn't -- you know, some things was

11   just -- wasn't under my control; and, you know,

12   that was the only time I've been through something

13   like that.  I've been blessed to kind of get past

14   that, and I'm just trying to, you know, just finish

15   out, you know, this -- my life.

16           I'm not out here -- not -- no gang

17   affiliation or nothing like that.  I never got into

18   trouble before, and I haven't been in trouble

19   since.  And I do -- I have done productive things,

20   and I had certain accomplishment.  Though I've been

21   through other things as well but just trying to

22   show that, you know, because -- yeah, I've been --

23   I get judged a lot.

24           So I just wanted them to see that -- know

25   that this is a side of me.  This is who I am and

Kobeay Swafford                              February 14, 2025

Page 124

1    not just some person out here on some, you know --

2    you know, reckless -- you know, just out there just

3    doing recklessness stuff.  I'm not that person.

4        Q.    All right.  So then at the end of this you

5    say (as read):

6            "I'm writing this in hope you will review

7    and reconsider your decision."

8            You see that?

9        A.    Right.

10       Q.    And Evansville does reconsider its

11   decision; right?

12       A.    Yes.

13       Q.    Okay.  Now, can I have you turn to tab 5

14   in your notebook.

15           MR. ST. GEORGE:  Have this marked as

16   Exhibit 5.

17           (Exhibit 5, letter, August 29, 2023,

18           SWAFFORD 0042.)

19       Q.    Okay.  So Evansville reconsiders its

20   decision and decides to grant you a voucher --

21       A.    Yes.

22       Q.    -- right?

23           So just looked at your email that was

24   dated August 21st; right?

25       A.    Yes.

Page 125

1      Q.   All right.  And then we've got a letter

2   here that has been marked as Exhibit 5.

3           Are you familiar with this letter?

4      A.   Yes.

5      Q.   Okay.  And this letter is dated August

6   29th, 2023?

7      A.   Yes.

8      Q.   Okay.  And what is this letter in Exhibit

9   5?

10     A.   Mandatory attendance for the orientation.

11     Q.   Okay.  And so this is telling you that

12  you've completed your eligibility determination.

13  So at this point in time you've been awarded the

14  voucher and then there's an orientation that you

15  have to attend; is that right?

16     A.   Right; correct.

17     Q.   All right.  So was this -- was this when

18  you came to be aware that your voucher had been

19  approved, or had you actually been told that at any

20  point earlier?

21     A.   This is when I was aware that my -- after

22  I sent the email.

23     Q.   Okay.

24     A.   'Cause I was aware that they approved it.

25     Q.   Okay.  So just to make sure I've got it

Page 126

1   straight.  You send the email.  You don't have any

2   further contact with Evansville until you get this

3   letter on August 29th?

4       A.   Correct.

5       Q.   All right.  So they didn't call you, for

6   instance, to discuss the character evidence or the

7   documents that you had submitted?

8       A.   No.

9       Q.   Okay.  All right.  So you get this letter

10  on August 29th, and at that point in time you

11  understand that you'd been approved for a voucher?

12      A.   Correct.

13      Q.   All right.  And it says the orientation is

14  scheduled for September 8th, 2023, at 9:00 a.m.

15           Do you see that?

16      A.   Yup.

17      Q.   Okay.  Did you attend that orientation?

18      A.   Yes.

19      Q.   Okay.  And it says (as read):

20           "During the orientation you will be

21  informed of the rules and regulations of the

22  program, and you will receive your voucher at this

23  time."

24           Do you see that?

25      A.   Uh-huh -- yes.

Kobeay Swafford                                February 14, 2025

Page 127

1     Q.   And so you did receive your voucher at

2  that orientation?

3     A.   Yes.

4     Q.   Okay.  All right.  So there's only a

5  period of about eight days from when you were

6  informed of the denial to when you were told you

7  were getting your voucher?

8     A.   Yeah.

9     Q.   Okay.  All right.  And then I believe your

10  testimony is that you took the voucher, and I guess

11  was it essentially -- well, let me back up.

12        So you get your voucher actually on

13  September 8th of 2023; right?

14     A.   Yes.

15     Q.   Okay.  And so when in relation to that

16  September 8th date did you then go to the complex

17  that you've described in Evansville and apply?

18     A.   I think I went right after the orientation

19  'cause I was still out there.  So I -- I passed it

20  head- -- you know, I had to pass it going home

21  anyways back to Kentucky.  So while I was out

22  there, I went to show the manager that I got the

23  voucher and --

24     Q.   And that's when you started the

25  application process?

Kobeay Swafford                                    February 14, 2025

Page 132

1      Q.   Well, that's the question I'm asking.

2      A.   Yeah, I believe.

3      Q.   Does this appear to be the form you filled

4   out online?

5      A.   Yeah, I thought I did it --

6           MR. FOK:  You can review the top document

7   before you answer his question just to make sure.

8      A.   (Witness reviews document.)  Yeah.

9      Q.   Okay.  All right.  And do you recall

10  filling out this form online?

11     A.   Yes.

12     Q.   All right.  And the very last page is a

13  copy of your driver's license?

14     A.   Yes.

15     Q.   Is that the document that you uploaded

16  online as well?

17     A.   Yes.

18     Q.   All right.  And if you look at the first

19  page of this applicant dispute form, is all of the

20  information that was filled out on this form

21  correct?

22     A.   Are you asking me is it correct?

23     Q.   Yes.

24          MR. FOK:  Objection.  Vague and ambiguous.

25  Calls for a legal conclusion.

1    A.   I mean, I believe I did it all correctly.

2    Q.   Well, I'm just asking you --

3    A.   Oh.

4    Q.   -- the information that is populated in

5    these fields, is that all accurate?

6    A.   (Witness reviews document.)  2262 -- yup.

7    Q.   Okay.  All right.  And then if I go to

8    page 3 of 5, which is on RG_45, there's a section

9    called "Criminal Records."

10   A.   Uh-huh.

11   Q.   It looks like there's a case number input

12   there, and then there's a reason.  (As read):

13        "This record does belong to me, but the

14   charges were dismissed."

15        Do you see that?

16   A.   Yes.

17   Q.   And do you recall filling out that

18   information online as well?

19   A.   Yes.

20   Q.   Okay.  All right.  Okay.  And let me have

21   you turn to Exhibit 7 as well.  If you can turn to

22   7, please.

23        MR. ST. GEORGE:  And I'll have this marked

24   as Exhibit 7.

25        MR. FOK:  My 7 is blank.

Kobeay Swafford                                    February 14, 2025

Page 134

1          (Discussion off the record.)

2          (Exhibit 7A, email, 8/28/2023,

3          RG_0303-318.)

4      Q.   All right.  So do you have in front of you

5   an email that's been marked as Exhibit 7A that is

6   from the kobeayswafford24@gmail.com sent on August

7   28th, 2023?

8          Do you see this?

9      A.   Yes.

10     Q.   Okay.  And is this an email that you sent

11  to RentGrow before you filled out the forms that we

12  just looked at?

13     A.   I guess, yeah.

14     Q.   Well, it says (as read):

15         "Hello, I'm requesting a dispute form

16  about the charges shown on my background check."

17     A.   Uh-huh.

18     Q.   (As read):

19         "Attached are certified legal documents of

20  the dismissal that proves the charges in Michigan

21  are shown in error.  I'm sending it in advance in

22  the hope that it's reviewed and the issue can be

23  resolved in a timely manner.  I thank you for your

24  assistance in this matter."

25         Do you see that?

Kobeay Swafford                                    February 14, 2025

                                                    Page 135

1        A.    Yeah.

2        Q.    That -- that is your correspondence that

3    you --

4        A.    Yes.

5        Q.    -- wrote to RentGrow?

6        A.    Yes.

7        Q.    All right.  And then the attachment --

8    going through the pages here, these are the same

9    documents that we looked at earlier that you sent

10   to Evansville; right?

11       A.    Yes.

12       Q.    All right.  So these would have been the

13   same documents that you had --

14       A.    Yes.

15       Q.    -- requested of the Wayne County circuit

16   clerk and that were mailed to you?

17       A.    Yes.

18       Q.    All right.  And so after you sent out

19   these -- sent to RentGrow these documents, you said

20   I'm requesting a dispute form.  The dispute form

21   was sent to you, and you filled out the dispute

22   form that we just looked at?

23       A.    Yes.

24       Q.    Okay.  All right.  Let me have you turn to

25   Exhibit 8, which I'll have marked as Exhibit 8,

Kobeay Swafford                                    February 14, 2025

Page 141

```
 1              AFTERNOON SESSION (12:28 PM)

 2       Q.   Mr. Swafford, I'll just remind you, you

 3   remain under oath.

 4       A.   Okay.

 5       Q.   If I can just have you turn again quickly

 6   to Exhibit 2 that we looked at.  This is the

 7   Supreme Court of Michigan decision dismissing the

 8   charges against you under the Interstate Agreement

 9   on Detainers.  I'm not going to ask you anything

10   specific about this opinion, but I do want to know

11   are you aware of anybody else in Michigan that has

12   a similar circumstance to you where a criminal

13   charge for homicide ended up being dismissed under

14   the Interstate Agreement on Detainers?

15            Anybody else that you're aware of that's

16   like you?

17       A.   Any other cases that -- not that I'm aware

18   of.

19       Q.   Okay.  All right.  So we were talking

20   about Evansville and the dispute process coming out

21   of Evansville, and we saw that you had attended the

22   orientation to get your voucher on September 8th.

23       A.   Uh-huh.

24       Q.   So I want to talk about, sort of, the time

25   period from September 8th moving forward --
```

Kobeay Swafford                                    February 14, 2025

                                                   Page 142

1      A.   Okay.

2      Q.   -- beginning with some of the other

3  applications.

4           So one of the things that I was doing

5  during the break was I was looking over my notes,

6  and in this case you identified a complex called

7  Colonial Manor.

8           Do you remember that one?

9      A.   That was Evansville.

10      Q.   That was going to be my next question.

11  Okay.  'Cause in the responses that we'll look at

12  in a little bit that you served in this case, it

13  says that you applied to Colonial Manor on

14  September 8, which is the same day you attended the

15  orientation.

16           So that was the Evansville property?

17      A.   Yes.

18      Q.   Okay.  And it also says that that

19  screening was done by a company called AppFolio.

20      A.   AppFolio.

21      Q.   Do you remember that?

22      A.   That's probably where I heard -- heard of

23  that before, yeah.

24      Q.   Okay.  So I know you had earlier talked

25  about it being RentGrow, but -- and I can show you

1    your responses in a little bit, but having heard

2    AppFolio, do you think it's now AppFolio?

3         A.   Yeah, maybe I made a mistake.

4         Q.   Okay.  No problem.  That's fine.

5              And it also seems like you were -- you

6    mention in your responses that there was actually a

7    denial at Colonial Manor due to an issue with

8    rental history.  Is that familiar?

9         A.   Yeah, that might have -- it was vague,

10   though.  To me it was just like they was just

11   coming up with an excuse.  I don't know.

12        Q.   Okay.  All right.  Well, we'll -- so

13   you're not sure if it was rental history or

14   criminal or anything like that?

15        A.   I just noticed after I mentioned the

16   criminal history, they just kind of -- it didn't

17   pan out.  It didn't fall through.  So...

18        Q.   Again, 'cause you identified to that --

19   the criminal history to them in advance?

20        A.   In advance, yeah.

21        Q.   Okay.  All right.  Is there some reason

22   why you didn't identify the criminal history in

23   advance to Evansville?  'Cause it sounds like you

24   had been having issues for a while.

25        A.   Well, because I never had an issue, like,

Kobeay Swafford                                    February 14, 2025

Page 169

```
 1        A.   Yes.
 2        Q.   All right.  And it says in the second
 3   paragraph (as read):
 4             "Your rental application was declined
 5   because you or the group you applied with did not
 6   meet the property's minimal rental requirements."
 7             You did not apply with a group; right?
 8        A.   No.
 9        Q.   You applied by yourself?
10        A.   Yes.
11        Q.   Okay.  All right.  And then do you see the
12   next paragraph says (as read):
13             "Your individual result was affected by:
14   Criminal history does not meet property
15   requirements; minor level of collection items."
16             Do you see that?
17        A.   Yes.
18        Q.   Okay.  And do you see further down it
19   identifies RentGrow and provides an address and
20   some contact information from RentGrow?
21        A.   Yes.
22        Q.   Okay.  So did you do -- did you get back
23   in touch with Mallard's Landing after you got --
24   again, let's stay in the March of 2024 time period
25   'cause I know now there's -- there's another
```

Page 170

1    application or another acceptance.

2            After you got this letter in March of 2024

3    from Mallard's Landing, did you reach back out to

4    Mallard's to discuss it?  Did you have any contact

5    with them?

6        A.   Yes.

7        Q.   Okay.

8        A.   I think I did.

9        Q.   What do you think happened?

10       A.   I mean, I went there, spoke with someone,

11   and they was telling me -- well, you know what?

12   Actually, I think after that that's how -- I went

13   to the next -- it's called Hickory Lake, I think,

14   the one apartment complex 'cause I was denied

15   there.

16           So I just went next door and spoke with

17   leasing there and explained my situation and

18   everything, what happened at Mallard's.  And they

19   was more open to work with me if I had proof or to

20   show some -- proof of what I was saying was -- was

21   correct, you know, they could get me in.

22           So they -- I kind of left Mallard's

23   Landing alone and went to Hickory Lake.

24           While I was doing that process I was

25   homeless briefly for about around a month because

Kobeay Swafford                                    February 14, 2025

Page 172

```
 1      A.    Yes.

 2      Q.    So same packet?

 3      A.    Same packet.

 4      Q.    All right.  So when did you do that?

 5  'Cause you get this letter on March 9th.  So I'm

 6  trying to just build a timeline.

 7      A.    It was, like -- it was immediate.  I don't

 8  know what 'cause I --

 9      Q.    Okay.

10      A.    It was, like, immediate.

11      Q.    All right.  So same day or next day.

12  Something like that?

13      A.    Within that week or so.

14      Q.    All right.

15      A.    Give or take.

16      Q.    Okay.  So you reach back out to Mallard's.

17  You give them the same packet of -- of court

18  records that you gave to Evansville --

19      A.    Uh-huh.

20      Q.    -- what happens after that?

21      A.    Well, I was denied.  They said they

22  couldn't rent to me.

23      Q.    Okay.  Did they call you after that, or

24  did you have any -- did you get any further letters

25  or anything?
```

Kobeay Swafford                                    February 14, 2025

Page 173

1        A.   I spoke -- I went down there, I think,

2   spoke with someone --

3        Q.   Okay.

4        A.   -- in person.

5        Q.   Do you recall who?

6        A.   No.

7        Q.   Okay.  All right.  And then your testimony

8   is that your application remained denied?

9        A.   It remained denied.

10        Q.   Okay.  All right.  So that's Mallard's.

11             Any further conversations with Mallard's

12   at that point in time after you had that

13   conversation that says you're still denied even

14   after you provide the records?

15        A.   So at that point I gave up and went to

16   Hickory Lake.

17        Q.   All right.  So did you go to Hickory

18   Lake -- when in relation to the process that you've

19   described with Mallard's did you go to Hickory

20   Lake?

21        A.   It was like, I guess, right after the

22   denial I was already down there.  And basically

23   just walked next door to see if they had anything

24   available, and just went from there.

25        Q.   Okay.  So after you were initially denied

February 14, 2025

Page 174

1   at Mallard, you walk across the street,

2   essentially --

3       A.   Basically, yeah.

4       Q.   -- and you go over to Hickory Lake?

5       A.   Yeah.

6       Q.   'Cause you were already down there?

7       A.   Right.

8       Q.   You were already down there applying at

9   Mallard's?

10      A.   Exactly.

11      Q.   All right.  And so it sounds like you walk

12  over there.  You talk to Hickory Lake.  That must

13  have been before you had given Mallard's the

14  additional documents; is that right?

15      A.   That was after, I believe.

16      Q.   Okay.

17      A.   So after I had given Mallard's Landing

18  all -- I tried to, you know, show them that --

19  those documents and, you know, went through all of

20  that process.  I was denied, and then I went next

21  door.

22      Q.   Okay.  So you went to Hickory Lake after

23  you had given Mallard's the documents and they told

24  you you were still denied?

25      A.   Right.

Page 175

1       Q.   And you were already down there at that

2    point.  So you walked over to Hickory Lake?

3       A.   Right.

4       Q.   And the letter I have here that we're

5    looking at as Exhibit 11 is dated March 9th of

6    2024.

7            Given that, I mean, do you know when you

8    went over to Hickory Lake?  Was it the same day

9    or...

10      A.   I can't recall.

11      Q.   Okay.

12      A.   I want to say yes, but I'm --

13      Q.   All right.  So maybe same day?  Maybe next

14   day?  Something like that?

15      A.   Somewhere -- yeah, it was, like,

16   immediate.  Yeah.

17      Q.   Okay.  So you walk over to Hickory Lake,

18   and did you -- you say you walked over there 'cause

19   you saw they had a leasing office open?

20      A.   Yeah.

21      Q.   All right.  And it's literally -- is it,

22   like, right next door?

23      A.   It was right next door, yeah.  Right next

24   door.  It was across the street.  Pretty big

25   complex.

Kobeay Swafford                                    February 14, 2025

Page 176

```
 1        Q.   All right.  So you walk across the street.

 2   Go to their leasing office.  Tell me what happens

 3   at Hickory Lake.

 4        A.   Asked if they had any openings.  Basically

 5   explained my situation, and they was more open to

 6   work with me.

 7        Q.   And so how does --

 8        A.   If I provided -- if I provided, you know,

 9   the -- you know, the documents to show what I was

10   trying to explain.

11        Q.   Okay.  So you were up front with Hickory

12   Lake --

13        A.   Yes.

14        Q.   -- about the criminal records --

15        A.   Yes.

16        Q.   -- and the documents that you would want

17   to show them?

18        A.   Yeah.

19        Q.   All right.  So do you show them the

20   documents?

21        A.   Yup.

22        Q.   All right.  And what happens after that

23   point?

24        A.   After that we got the rental process.  I

25   had to get my -- you know, get -- give them the
```

 1    voucher.  They was going through a change of -- I

 2    happen to catch them while they was going through a

 3    change of ownership thing they had going.  And also

 4    I had to -- we was trying to hurry up and get

 5    this -- they had an apartment ready.  We had to get

 6    an inspection, though.

 7            And Section 8 on their end -- no, on the

 8    apartment end, they kept failing -- they failed the

 9    inspection a couple of times, but at that point I

10    already signed off my -- you know, the stuff I had

11    going on at Oak Grove.  I already -- like, with the

12    landlord, I had already, as far as the lease and

13    everything, told them I was moving and had a case,

14    yeah.

15            So between moving from Oak Grove and

16    trying to wait for this apartment, I had a period

17    of being homeless, and then when they finally got

18    their thing in order, I was able to move in.

19        Q.   Okay.  All right.  So -- so you apply over

20    at Hickory Lake.  You explain your situation

21    proactively, and then you get accepted to live over

22    there?

23        A.   Yeah.

24        Q.   Did they run a background report on you?

25    Do you know?

Kobeay Swafford                                    February 14, 2025

                                                    Page 178

1        A.    Yeah.

2        Q.    Did it show any criminal history?

3        A.    I showed them those documents, and she

4   sent them to their -- to their office or, you know,

5   the -- what do you call that?  The -- to her boss.

6        Q.    Okay.

7        A.    And, yeah, they got me in there.  So...

8        Q.    So I guess the question I'm asking you is

9   so you know they ran a background check?

10       A.    Yes.

11       Q.    Did you ever see that background check?

12  Did it have your criminal records on it?

13       A.    I think it had; but, like I say, I gave

14  them that other information.  So...

15       Q.    Okay.  And then it was taken to another

16  employee and the application was approved?

17       A.    Yeah.

18       Q.    All right.  And then you say there was a

19  period of time until you could actually move in?

20       A.    Right.

21       Q.    How long a period was that?  About a

22  month?

23       A.    About a month.

24       Q.    All right.  And you say you had already

25  told your Oak Grove landlord that you were moving

Kobeay Swafford                                    February 14, 2025

                                              Page 182

1       Q.   Did you have your own bedroom?

2       A.   What's the name -- no, I had to share a

3    bedroom.

4       Q.   Okay.

5       A.   It was, like, seven or eight of us in

6    there, one house or something.

7       Q.   All right.

8       A.   If that.  Give or take.

9       Q.   All right.  So you were there for a month?

10      A.   Took about a month.

11      Q.   I'm sorry?

12      A.   Yeah, took about a month.

13      Q.   And then you moved into the Antioch

14   complex?

15      A.   Yeah, when they got it -- yeah, finally

16   got it together.

17      Q.   Okay.  And the Antioch complex was waiting

18   on inspections to be cleared before the apartment

19   could be --

20      A.   Section 8.

21      Q.   -- given to you?

22      A.   Yes.

23      Q.   Okay.  All right.  During this -- during

24   this time period when you're moving out of Oak

25   Grove, moving into the VA home, and then moving

Kobeay Swafford                                    February 14, 2025

                                                    Page 185

1    report -- do you ever recall submitting any dispute

2    to RentGrow regarding the Mallard's Landing report?

3         A.   I thought I sent the dispute, the thing I

4    had, but I'm not sure.

5         Q.   Okay.  Do you recall any other contacts

6    with RentGrow after you applied to Mallard's

7    Landing?

8         A.   Not that I could remember exactly.  I'm

9    not sure.

10        Q.   Okay.  All right.  So we -- we established

11   very early on in this deposition that you -- you

12   lived in Antioch until January of 2025 when you

13   actually moved into Mallard's Landing?

14        A.   January 2nd.

15        Q.   Okay.  January 2nd, 2025?

16        A.   Yes.

17        Q.   Okay.  And there was no gap in housing

18   from when you moved out of the Antioch complex, you

19   moved right into the Mallard's Landing's complex?

20        A.   Yes.

21        Q.   Okay.  All right.  And I believe it was

22   your testimony that you were living in Antioch and

23   you had reached back out to Mallard's Landing

24   sometime in the summer or fall to see if they had

25   any available units?

1            So are you claiming that you have been

2     harmed in some way due to the conduct of RentGrow?

3            MR. FOK:  Objection.  Calls for expert

4     opinion.  Legal conclusion.

5        A.    A lot of anxiety about, you know, just --

6     you know, still got that over my head.  What if,

7     you know, if I'm applying or look for, you know,

8     certain opportunities.  I don't know what's -- to

9     -- what to expect.  So this is giving me a lot of

10    -- worry and anxiety.

11       Q.    Okay.  Any -- anything else?  I mean, so

12    I'll talk about your anxiety, but anything else in

13    terms of, you know, harm to you that you're

14    claiming in this case?

15           MR. FOK:  Objection.  Vague and ambiguous

16    and calls for expert opinion and legal conclusion.

17       A.    The harm is like certain -- you know, the

18    hassle, the missed opportunities.  If -- you know,

19    things -- things like that, I guess.

20       Q.    And you say hassle and missed

21    opportunities.  Those relate to the denial of your

22    housing applications?

23       A.    That -- yeah, and certain jobs, you know,

24    had -- like, prior to this and -- 'cause this has

25    been going on for years.  And like --

Kobeay Swafford                                    February 14, 2025

Page 212

1    years that you described.

2            I want to focus on -- I want to focus on

3    the application to Evansville and the application

4    to Mallard's.

5        A.    Okay.

6        Q.    'Cause those are the two instances where

7    RentGrow was involved; right?

8        A.    Right.

9        Q.    All right.  So the anxiety that you

10   described as it relates to those two applications,

11   those -- that would be because you didn't get the

12   housing that you applied for?

13       A.    Yeah, all the hassle and everything, yeah,

14   and --

15       Q.    So it's because --

16       A.    -- that I denied.

17       Q.    -- because you were denied and didn't get

18   the housing you applied for?

19       A.    Right.  Which led me going through some

20   other -- you know, like, if I wasn't denied in the

21   first place at Mallard's, I feel like I wouldn't

22   have had to go through the Hickory Lake thing and

23   then, you know, just that led to one thing and, you

24   know, for them to turn around and how they accept

25   me but like -- accepted my application and

Kobeay Swafford                                    February 14, 2025

Page 213

```
 1   everything; but, yeah, if -- if that wasn't -- if
 2   that didn't happen in the first place, you know,
 3   I could have probably already settled in and
 4   wouldn't -- just -- had to go through all of this
 5   other stuff.  I just -- extra stuff I've been going
 6   through, I guess.  I see it.
 7        Q.   So with respect to RentGrow, your anxiety
 8   and your damages, they all relate to the fact that
 9   you were denied housing and weren't able to settle
10   in in the way that you wanted to do so?
11        A.   I mean, like I say, it -- so, yeah, like I
12   say, I think, yeah.
13        Q.   Okay.  And if you had gotten the housing
14   in Evansville, it would have been your intention to
15   settle in in Evansville; right?
16        A.   At that time, yeah.
17        Q.   Okay.  And I believe your testimony was
18   you had intended to settle there for at least a
19   year?
20        A.   Yeah at least, yeah.
21        Q.   Maybe longer?
22        A.   Yeah.
23        Q.   And if you hadn't been denied at Mallard,
24   your testimony is that you wouldn't have gone
25   through the anxiety and hassle of having to apply
```

Kobeay Swafford                                    February 14, 2025

Page 235

```
 1       Q.   Yeah.  Okay.  It says (as read):

 2            "Accordingly, plaintiff seeks recovery for

 3  his actual damages, including loss of earnings and

 4  emotional distress."

 5            Do you see that?

 6            MR. FOK:  Counsel, just for the record,

 7  it's probably a typo.  We can amend the complaint

 8  to delete the loss of earnings from that.

 9            MR. ST. GEORGE:  Okay.  Well, that was

10  going to be one thing I was going to ask you about.

11            There are no loss -- we agree there's no

12  loss of earnings?

13            MR. FOK:  We agree that this is a purely

14  tenant rent housing report.

15            MR. ST. GEORGE:  So you agree there is no

16  loss of earnings?

17            MR. FOK:  We will amend to delete that,

18  yeah.

19       Q.   All right.  And the emotional distress, is

20  there -- you've already described that to me

21  today -- right? -- in terms of your anxiety?

22            Is there anything different about your

23  emotional distress that we haven't already talked

24  about?

25       A.   What do you mean by that?
```

Page 236

1    Q.   Well, I'm just trying to ask you -- the

2    phrase here you used is "emotional distress."  Is

3    there something other than the anxiety that we've

4    already covered today that you would mean by the

5    phrase "emotional distress," or have we covered it?

6         MR. FOK:  Objection.  Vague and ambiguous.

7    A.   You're saying, like, is there anything

8    added?

9    Q.   Yeah, anything other than what you've

10   already told me about your anxiety that you would

11   regard as emotional distress.  Anything more?

12   A.   I don't know.  I don't know just -- this

13   thing is wearing me out right now.

14   Q.   Why don't we do this:  We're almost done,

15   but do you want -- do you want five minutes or so?

16   A.   Let me smoke another cigarette or

17   something.

18   Q.   Let's just take five minutes, then you can

19   come back fresh, and then we'll be almost done at

20   that point.  Okay?

21   A.   All right.

22        (Recess was taken.)

23   Q.   Mr. Swafford, are you ready?

24   A.   Yeah.

25   Q.   So before we took a break we were just

Kobeay Swafford                                    February 14, 2025

Page 237

1    looking at the complaint and I was asking about

2    this paragraph 20.

3            It says -- it talks about loss of earnings

4    and emotional distress.  I was asking about the

5    emotional distress component.

6            Is there any type -- are there any types

7    of distress that you're claiming in this lawsuit

8    that are -- that exist beyond what you've already

9    described or have you described them to me?

10       A.   That's all I could think of, but it's,

11   like -- as far as now, I could think of -- I don't

12   know.  Like, if I didn't -- I don't think I would

13   have had to go through that -- that little homeless

14   situation if I wasn't denied.

15       Q.   Uh-huh.  Okay.

16       A.   But the first time, though, I wouldn't

17   have had to go through the Hickory Lake and -- but

18   I already mentioned that.  So, yeah, I'll just

19   really be repeating myself, but yeah...

20       Q.   Okay.  All right.  Let me have you turn to

21   tab 21 in your binder which I'll have marked as

22   Exhibit 21.

23            (Exhibit 21, ICHAT, RG_000959-965.)

24       Q.   And there's actually two documents here.

25   There's -- the first document that's got the first